USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 08/03/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FRANCOIS MALHERBE, et al.,

Plaintiff,

-against-

OSCAR GRUSS & SON INC.,

Defendant.

21-CV-10903 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

This is an action under Article 53 of New York's Civil Practice Law and Rules ("CPLR") for recognition of default judgments that courts in Germany issued in favor of Plaintiffs against Defendant Oscar Gruss & Son, Inc. ("Gruss").[1] Plaintiffs and Gruss filed opposing motions for summary judgment under Federal Rule of Civil Procedure 56. *See* Dkt. Nos. 90 & 96. The crux of the dispute is whether the German courts had personal jurisdiction over Gruss at the time of the judgments and whether the Court should refuse to recognize the judgments due to arbitration clauses in agreements between Plaintiffs and Gruss.

[1] Plaintiff Francois Malherbe resides in Switzerland and was awarded a judgment on February 10, 2010. Dkt. No. 108 ¶¶ 3–4. Plaintiff the Estate of Samuel Meier prosecutes this case on behalf of executors Yvonne Meier and Andrew Meier-Faes, who reside in Switzerland and obtained a default judgment on February 2, 2010. *Id.* ¶¶ 5–7. Plaintiff Franz Stiller resides in Austria and obtained a default judgment on March 18, 2010. *Id.* ¶¶ 8–9. Plaintiff Herbert Kuss resides in Austria and obtained a default judgment on May 7, 2015. *Id.* ¶¶ 10–11. Plaintiff Leopold Schmudermaier resides in Austria and obtained a default judgment on January 16, 2015. *Id.* ¶¶ 12–13. Plaintiff Stephan Gartenmann resides in Switzerland and obtained a default judgment on July 6, 2009. *Id.* ¶¶ 14–15. Plaintiffs all obtained their default judgments in the Regional Court of Krefeld Germany. *Id.* ¶¶ 4, 7, 9, 11, 13, 15.

## BACKGROUND

### I. RELEVANT FACTS[2]

Gruss is a broker dealer registered with the Securities and Exchange Commission and incorporated in New York. Dkt. No. 61 ("SAC") ¶ 2. In the 1990s, Gruss sought to expand its business and engaged a German company called Gluch & Partner GmbH ("Gluch") to solicit foreign customers. Dkt. No. 9-2 at 2. Plaintiffs are citizens of Austria and Switzerland who became Gruss's clients through Gluch.

#### A. The FIA

In 1997, Gruss and Gluch executed a Foreign Introducing Agent Agreement (the "FIA"). Dkt. No. 99-3 at 2. The agreement specified that Gluch would act "as a foreign introducing agent on behalf of [Gruss] in which capacity it would introduce to [Gruss] certain foreign individuals and entities who would open accounts" at Gruss and purchase options listed on U.S. securities exchanges. *Id.* Gruss agreed to pay Gluch 10% of funds deposited by a customer Gluch solicited, plus a $35 commission for every trade executed by or on behalf of those customers. *Id.* at 3. Gruss would make payments "by wiring funds to such account in Germany as Gluch may designate." *Id.*

[2] The following facts are taken from the Joint 56.1 Statement (Dkt. No. 108), the parties' individual 56.1 Statements where necessary and where the facts therein are neither undisputed or not materially disputed with evidence from the record, and from documents accompanying the parties' declarations. The Court refers to the parties' memoranda of law in support of and opposition to the motions for summary judgment as follows: Plaintiffs' memorandum supporting their motion for summary judgment (Dkt. No. 109) as "Pls. Mot."; Gruss's opposition brief (Dkt. No. 122) as "Gruss Opp."; Plaintiffs reply (Dkt. No. 123) as "Pls. Reply"; Gruss's memorandum supporting its motion for summary judgment (Dkt. No. 97) as "Gruss Mot."; Plaintiffs' opposition brief (Dkt. No. 120) as "Pls. Opp."; and Gruss's reply brief (Dkt. No. 124) as "Gruss Reply." Citations to pages of these documents correspond to the pagination on the documents themselves. Citations to pages of other documents refer to the page numbers as shown on ECF.

The agreement included a representation that the compensation scheme did not violate the law of "any non-U.S. jurisdiction to which Gluch is subject." *Id.* at 4. It also committed Gluch to supplying the opinion of its "German counsel" in support of that representation. *Id.* at 6. Complying with that obligation, Gluch's attorney provided a letter opining on whether "the intended business will be prohibited under German law" and certifying that the "compensation to be payable by [Gruss] to [Gluch] pursuant to the FIA Agreement does not in our opinion violate German law." *Id.* at 8. The opinion letter did not analyze the law of any other jurisdiction. *Id.*

**B. The Client-Intake Agreements**

After Gluch solicited customers for Gruss, the customers would execute a suite of client intake agreements to become Gruss's clients. In the present action, neither Gruss nor Plaintiffs have the original account-opening agreements that Plaintiffs signed. *See* Dkt. No. 108 ¶ 18. But Gruss has produced sample documents that it alleges new customers would always sign in the relevant time periods. *See* Dkt. Nos. 102-1 and 111-3. Five of those agreements are relevant to this Opinion.

First, an "Introduced Foreign Customer Supplementary Agreement" on Gruss letterhead authorized Gruss to transfer money from Plaintiffs' accounts to Gluch. Dkt. No. 102-1 at 12.[3]

Second, a "Trading Authorization Agreement," also on Gruss letterhead, gave Gluch power of attorney to make trades on Plaintiffs' behalf. *Id.* at 3.

Third, a "Customer Agreement" specified that disputes would be subject to arbitration and included two "customer" signature lines, but no signature line for Gruss. *Id.* at 3–4.

[3] Some customers seemingly signed a document on Gluch letterhead with a similar authorization. *See* Dkt. No. 111-3 at 1–2.

Fourth, a document the Court refers to as the "Terms Agreement" that stated that "[t]his letter . . . set[s] forth our respective rights and obligations." The Terms Agreement set out 17 legal distinct legal provisions, including an arbitration clause. It included a signature line for a customer only, with no signature line for Gruss. *Id.* at 8.

And fifth, an "Options Agreement" stated that exchange rules required Gruss to seek certain information "to assist [Gruss] in making recommendations," solicited "personal & financial data," and featured a signature line for a client and Gruss's agent. *Id.* at 7. It did not include any arbitration clause. As will be relevant later, Gruss alleges that the Terms Agreement and Options Agreement appeared on opposite sides of a single document. Gruss Opp. at 19; Dkt. No. 103 ¶ 26.

**C. The Lawsuits before the German Courts**

Acting under the FIA, Gluch solicited Plaintiffs to become Gruss customers, and Plaintiffs purportedly signed the five agreements discussed above.

The FIA provided that Gruss would send a $35 commission to Gluch in Germany for every transaction on the account of a customer solicited by Gluch. Dkt. No. 99-3 at 2. The Trading Authorization Agreement, meanwhile, gave Gluch power of attorney to make trades on the accounts of customers whom it solicited. Dkt. No. 102-1 at 3. Armed with the power of attorney, and eager to extract commission payments, Gluch proceeded to execute an excessive number of risky trades on Plaintiffs' accounts. These trades generated a small fortune in fees for Gluch but, due to their risks, quickly depleted the funds in Plaintiffs' accounts.

Plaintiffs responded by suing Gruss in Germany (Gluch was insolvent by that time and Plaintiffs did not name it as a defendant). Dkt. No. 108 ¶¶ 29, 33–34. Gruss failed to appear in any of the lawsuits, however, and the German courts entered default judgments against Gruss

(collectively, the "Judgments"). *Id.* ¶ 42; *see, e.g.*, Dkt. No. 9-2.[4] The German courts reasoned that Gruss must have known that the structure of its agreements incentivized Gluch to churn Plaintiffs' accounts, but that Gruss nevertheless failed to properly protect against the foreseeable harm from those incentives or advise its customers of the risks. Dkt. No. 9-2 at 3–6.[5] As a remedy, the German courts awarded Plaintiffs the difference between their initial investments and the amount Gruss ultimately returned to them. *Id.* at 8.

**D. The Miller Action**

Although Gruss did not appear in any of Plaintiffs' lawsuits, it did appear in a similar lawsuit in Germany that non-plaintiff and German citizen Frank Miller filed before Plaintiffs commenced their suits (the "Miller Action"). *See* Dkt. No. 111-6. In the Miller Action, Gruss appeared and argued that the proceeding violated Gruss and Miller's agreement to arbitrate in the Customer Agreement. *Id.* The German court in the Miller Action rejected that argument and determined that—because Gruss never signed the Customer Agreement—the arbitration clause in the agreement was invalid under the New York Convention, which governs the recognition and enforcement of arbitration awards. *Id.* at 5; *see* 21 U.S.T. 2517, T.I.A.S. No. 6997.[6]

Article II(1) of the New York Convention requires each "Contracting State" to "recognize an agreement in writing" committing the parties to arbitrate a dispute. *Id.* at 2519. Article II(2) defines an agreement in writing as including "an arbitral clause in a contract or an

[4] The Court cites only to the default judgment issued in favor of Plaintiff Francois Malherbe (Dkt. No. 9-2) where it is indicative of all five default judgments at issue in this lawsuit.

[5] "Churning occurs where a securities dealer creates commissions by inducing transactions in a customer's account which are disproportionate to the size and character of that account." *Siegel v. Tucker, Anthony, & R.L. Day, Inc.*, 658 F. Supp. 550, 553 (S.D.N.Y. 1987). The Court cites to one judgment—in lieu of all five—when the judgment is indicative of the rest.

[6] The New York Convention is also referred to as the Recognition and Enforcement of Foreign Arbitral Awards. The German court in the Miller Action referred to it as the UN Convention.

arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams." *Id.* The German court in the Miller Action reasoned that "[i]rrespective of the question of which law to apply in order to assess the validity of the arbitration [clause]," the Customer Agreement's arbitration clause was invalid because Gruss did not sign the Customer Agreement nor was it contained in letters or telegrams between the parties, as Article II(2) requires. Dkt. No. 111-6 at 5.

As a separate rationale for its holding, the German court in the Miller Action determined that the Customer Agreement lacked the formalities that German law required. *Id.* And it ruled that the choice of law provision in the Customer Agreement should be analyzed under German law because Miller had his primary residence in Germany. *Id.*

## II. PROCEDURAL HISTORY

After obtaining the Judgments from the German courts, Plaintiffs commenced this lawsuit seeking recognition of the Judgments under the New York Uniform Foreign Country Money Judgments Act, CPLR Article 53, § 5300 et seq. Dkt. No. 1. Plaintiffs now seek summary judgment recognizing the Judgments while Gruss seeks summary judgment dismissing this action. *See* Dkt. Nos. 90 & 96.

# DISCUSSION

## I. LEGAL STANDARD ON SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure provides that a court shall grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[7] "A fact is 'material' when it 'might affect the outcome of the suit under governing law.'" *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)). In determining whether a genuine issue of material fact exists, "[t]he evidence of the nonmovant is to be believed," and a court must draw "all justifiable inferences" in favor of the nonmovant. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

Once the movant has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in [the nonmovant's] favor." *Anderson*, 477 U.S. at 256. Reliance upon "conclusory statements" or "mere allegations" is not sufficient to defeat summary judgment. *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532–33 (2d Cir. 1993).

## II. ARTICLE 53 GOVERNS THIS LAWSUIT

Plaintiffs seek recognition of the Judgments under Article 53, CPLR § 5303. Article 53 "codif[ies] and clarif[ies] existing case law applicable to the recognition of foreign country money judgments based on principles of international comity." *Abu Dhabi Commercial Bank*

[7] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

*PJSC v. Saad Trading Contr. & Fin. Servs. Co.*, 117 A.D.3d 609, 610 (N.Y. App. Div. 1st Dep't 2014). It also serves to offer "streamlined enforcement" of foreign judgments in the State of New York. *CIBC Mellon Trust Co. v. Mora Hotel Corp. N.V.*, 100 N.Y.2d 215, 221 (N.Y. 2003). Courts apply Article 53 in two steps. First, a court assesses if Article 53 applies to an action. If it does, a court then considers whether a "ground for non-recognition" applies that would prevent the court from recognizing the foreign judgment. Article 53 applies to any foreign country judgment which is "final, conclusive, and enforceable" where rendered. N.Y. C.P.L.R. § 5302. "[A] foreign country money judgment is considered 'conclusive between the parties to the extent that it grants or denies recovery of a sum of money.'" *CIBC Mellon Trust Co.*, 100 N.Y.2d at 221 (quoting N.Y. C.P.L.R. § 5303). Because Plaintiffs have shown the Judgments are final, grant a sum of money, and are enforceable where rendered, Article 53 applies to this action.

## III. NO "GROUNDS FOR NON-RECOGNITION" APPLY

If Article 53 applies, a court is bound to recognize a foreign money judgment and may refuse to do so only if one of the "grounds for nonrecognition under CPLR 5304" applies. *John Galliano, S.A. v. Stallion, Inc.*, 15 N.Y.3d 75, 80 (N.Y. 2010). CPLR § 5304 divides these grounds for nonrecognition into two groups, "mandatory grounds for dismissal, under subdivision (a), and discretionary grounds, under subdivision (b)." *Malherbe v. Oscar Gruss & Son, Inc.*, No. 21-CV-10903 (MKV), 2023 WL 199425, at *2 (S.D.N.Y. Jan. 17, 2023). Two such grounds are relevant to this lawsuit. First, Section 5304(a)(2) provides that a court may not recognize the judgment of a foreign court if the foreign court lacked personal jurisdiction over a defendant. Second, Section 5304(b)(5) provides that a court may refuse to recognize a foreign court's judgment if "the proceeding in the foreign court was contrary to an agreement between

the parties under which the dispute in question was to be determined otherwise than by a proceeding in that court." N.Y. C.P.L.R. § 5304(b)(5).

Gruss argues that the mandatory exemption in Section 5304(a)(2) applies because the German courts lacked personal jurisdiction over it and that the discretionary exemption in Section 5304(b)(5) applies because the German court's proceeding violated arbitration clauses contained in the agreements that Plaintiffs purportedly signed. Plaintiffs, of course, dispute both of these claims.

**A. Section 5304(a)(2) Does Not Apply**

Section 5304(a)(2) states: "A court of this state may not recognize a foreign country judgment if the foreign court did not have personal jurisdiction over the defendant." N.Y. C.P.L.R. § 5304(a)(2). This exemption is mandatory, *i.e.*, a court may not recognize a foreign judgment if a court determines the exemption applies. To make that determination, a court examines if the "exercise of jurisdiction by the foreign court comports with New York's concept of personal jurisdiction." *John Galliano, S.A. v. Stallion, Inc.*, 15 N.Y.3d 75, 81 (N.Y. 2010) (quoting *Sung Hwan Co., Ltd. v. Rite Aid Corp.*, 7 N.Y.3d 78, 83 (N.Y. 2006)). Under New York law, the exercise of personal jurisdiction is proper if it (1) complies with "a state-law statutory basis" and (2) comports with due process. *Charles Schwab Corp. v. Bank of Amer. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018). Because the German court's exercise of jurisdiction over Gruss complied with New York's long-arm statute (if New York had been the jurisdiction) and comported with due process, the mandatory exemption in Section 5304(a)(2) does not apply.

**1. New York's Long-Arm Statute Is Satisfied**

Plaintiffs allege the German courts had specific jurisdiction over Gruss consistent with New York's long-arm statute. Pls. Mot. at 18–19. New York's long arm statute provides that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through

an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1). Two things must be true to exercise personal jurisdiction under the statute: "(1) the defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." *Sole Resort, S.A. de C.V. v. Vallures Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006). The first prong requires a "purposeful availment of the privilege of doing business in the [German] forum." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013); *see also Spetner v. Palestine Investment Bank*, 70 F.4th 632, 639 (2d Cir. 2023) ("Because the touchstone for jurisdiction under New York's long-arm statute is the intent to reach the forum, jurisdiction cannot be based on conduct in the forum that is extraneous or coincidental."). It can be satisfied by a defendant's transacting business in a forum or by a defendant's agent transacting business therein. The second prong requires that an element of the cause of action arises from, supports, or bears a relationship with the defendant's relevant contacts with the forum. It is satisfied "where there exists an articulable nexus or a substantial relationship between [the] transaction occurring with the state and the action sued upon." *Spetner*, 70 F.4th at 643.

**a. Gruss "Transacted Business" in Germany**

Here, the first requirement is satisfied both because Gruss purposefully availed itself of the privilege of doing business in Germany and because of Gruss and Gluch's agency relationship. Gruss sought access to foreign clients to expand its business. To that end, it purposefully reached out across the Atlantic to Gluch, a German entity. It executed a contract, the FIA, obligating Gluch to serve Gruss as its foreign agent in Germany. Because Gluch operated exclusively in Germany,[8] all the customers that Gluch solicited for Gruss involved

[8] The FIA required Gluch's "German counsel" to provide an opinion confirming that the FIA's compensation scheme did not violate the laws of any jurisdiction to which Gluch was subject. Dkt. No.

contact with Germany. Furthermore, Gruss paid all of the $35 commissions to Gluch by wires sent to Germany. Dkt. No. 99-3 at 3.

Given the above, the Court has little trouble concluding that Gruss transacted business in Germany, satisfying the first prong of New York's long-arm statute. Gruss purposefully availed itself of the opportunity to do business in Germany by executing the FIA, which created an ongoing business relationship in Germany where Gluch's offices were located, where Gluch would make efforts to solicit customers for Gruss, and where Gruss sent Gluch's compensation for those efforts.

The first requirement is met for the separate reason that Gluch acted as Gruss's agent in Germany. Section 302(a) permits a forum to exercise personal jurisdiction over a principal if its agent acted in the forum "[(1)] for the benefit of, [(2)] with the knowledge and consent of, and [(3)] under some control by the nonresident principal." *Charles Schwab Corp.*, 883 F.3d at 85. "Agency within the meaning of § 302(a) is given a broad interpretation" and a "plaintiff does not need to establish a formal agency relationship in order to attribute the action of the agency to principal." *Spetner*, 70 F.4th at 640. In assessing the control element, a principal exercising "some control" is sufficient. *Id.* at 641; *see also id.* (commenting that Section 302(a)(1) "does not demand that the principal exercise complete control over every decision of the putative agent").

Gluch acted for the benefit of Gruss in Germany by soliciting customers to open accounts with Gruss. Gruss clearly had knowledge of these actions: Gluch acted under an agreement that Gruss executed and Gruss compensated Gluch for each customer that Gluch solicited. Lastly,

99-3 at 2. Tellingly, Gluch's counsel discharged this obligation via an opinion that spoke only to the compensation scheme's legality under German law, which Gruss accepted. *Id.* at 6.

Gruss had "some control" over Gluch because Gluch acted under the terms of the FIA. *See Scholastic, Inc. v. Stouffer*, No. 99-CV-11480 (AGS), 2000 WL 1154252, at *6 (S.D.N.Y. Aug. 14, 2000). Gruss could unilaterally reject any proposed client without explanation to Gluch. Gruss could extract payments from Gluch for "any amounts which may be owed to [Gruss] at any time by any Introduced Person and for all costs and expenses." Dkt. No. 99-3 at 4. And Gruss "in its sole discretion" could deduct from payments to Gluch "any amounts which may be owed to [Gruss]." *Id.* Accordingly, the first requirement for New York's long-arm statute to apply is met for the separate reason that Gluch acted in Germany as Gruss's agent.

**b. The Claims Arise from the Defendant's Activity in the Forum**

The New York long-arm statute's second requirement is met as well. The underlying action in Germany involved claims that Gruss created a compensation structure for Gluch that incentivized Gluch to churn Plaintiffs' accounts, and that Gruss was aware of Gluch's churning activity. Dkt. No. 9-2 at 3–6. The compensation structure that Plaintiffs complained of was an integral aspect of the FIA, and the FIA itself is at the core of Gruss's purposeful availment of the privilege of doing business in Germany. *See Licci v. Lebanese Can. Bank, SAL*, 20 N.Y.3d 327, 329 (N.Y. 2012). Furthermore, Gluch churned Plaintiffs' accounts to generate a $35 commission per trade, which Gruss transmitted to Gluch in Germany. These payments facilitated Gluch's conduct, *Spetner*, 70 F.4th at 632, and constitute a separate relevant contact between Gruss and Germany.

**2. The Due Process Clause Is Satisfied**

Having determined that the German court's exercising personal jurisdiction over Gruss complied with New York's long-arm statute, the Court must next consider whether the exercise of jurisdiction comported with due process. "Where, as here, specific jurisdiction is invoked, the Due Process Clause of the Constitution requires that the defendant have sufficient 'minimum

contacts' with the forum and that jurisdiction 'not offend traditional notions of fair play and substantial justice.'" *Spetner*, 70 F.4th at 644–45 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Due Process Clause requires that a "defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Licci*, 732 F.3d at 168. "The contacts must be the defendant's own choice and not random, isolated, or fortuitous." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021). Additionally, the plaintiff's claim "must arise out of or relate to the defendant's contacts with the forum." *Id.* As the Second Circuit has noted, "[h]istorically, when we have found § 302(a)'s requirements satisfied based on an agent's contacts with the forum, we have not suggested that due process requires something more than New York law." *Spetner*, 70 F.4th at 645; *see also Relevant Sports LLC v. United States Soccer Federation, Inc.*, 61 F.4th 299, 306 (2d Cir. 2023) (determining that "the same alleged contacts that subject [defendant] to New York's long-arm statute . . . satisfy the Constitution's due process requirement of minimum contacts with New York such that the suit does not offend traditional notions of fair play and substantial justice").

The Due Process Clause is satisfied for the same reasons that the exercise of personal jurisdiction in the underlying case complied with New York's long-arm statute. Gruss had sufficient "minimum contacts" with Germany because it executed the FIA with Gluch, a German-based entity, obligating Gluch to serve as Gruss's foreign agent in Germany. Dkt. No. 99-3 at 2–3. The contract had a minimum duration of one year and included a compensation structure wherein Gruss would send Gluch's weekly commissions to Germany. *Id.* at 3. It therefore contemplated a continuing relationship between the parties with repeated interactions, centered on Gluch's business operations in Germany. This purposeful availment of the privilege

of doing business in Germany establishes the requisite "minimum contacts" the Due Process Clause requires. *Walden v. Fiore*, 571 U.S. 277, 285 (2014) ("Accordingly, we have upheld the assertion of jurisdiction over defendants who have purposefully 'reached out beyond' their State and into another by, for example, entering a contractual relationship that 'envisions continuing and wide-reaching contacts' in the forum State." (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479–80 (1985))).

There is also a sufficient relation between Gruss's contacts with Germany and Plaintiffs' claims. Gluch had the capacity to churn Plaintiffs' accounts only because of the suite of onboarding agreements drafted and required by Gruss for new clients. Gluch had the incentive to churn Plaintiffs' accounts due to the compensation scheme established by Gruss in the FIA. And Gruss sent the payments arising from Gluch's churning activities to Gluch in Germany. These facts plainly show that Plaintiffs' claims "relate[d] to the defendant's contacts with the forum," namely the FIA and the commission payments. *Ford Motor Co.*, 592 U.S. at 362. As a result, the German court's exercise of personal jurisdiction comported with due process.

Accordingly, the German court had personal jurisdiction over Gruss and the mandatory exemption at § 5304(a)(2) does not apply.

**B. Section 5304(b)(5) Does Not Apply**

Gruss next argues the Court should not recognize the Judgments because the proceedings in Germany contradicted the arbitration clause in the onboarding agreements that Plaintiffs signed. Gruss Mot. 23–29. Section 5304(b)(5) provides that a court "need not recognize a foreign country judgment if . . . the proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be determined otherwise than by a proceeding in that court." N.Y. C.P.L.R. § 5304(b)(5). As the text makes clear, this exemption is discretionary. Responding to Gruss, Plaintiffs argue the judgment from the Miller Action

established that the Customer Agreement did not contain a valid arbitration agreement, and the Court should apply collateral estoppel. Pls. Opp. at 16–18. Plaintiffs also argue that the Court should not exercise its discretion to refuse to recognize the Judgments. *Id.* at 24.[9]

**1. Collateral Estoppel**

The Court may give preclusive effect to a foreign court's judgment as a "matter of comity" if the foreign proceeding producing the judgment was fair. *Diorinou v. Mezitis*, 237 F.3d 133, 139–40 (2d Cir. 2001). Gruss does not seriously dispute that the Miller Action was "fair." Therefore, the Court will defer to the foreign court's judgment in the Miller Action if the elements of collateral estoppel are met. *See ICC Chemical Corp. v. TCL Indus. (Malaysia)*, 206 F. App'x 68, 70 (2d Cir. 2006) ("[P]rotracted discussion on that score [regarding the fairness of a foreign judgment] is not necessary here because it is undisputed that [the plaintiff] had the opportunity to fully and fairly litigate the arbitrability issue before the [foreign court].").

Collateral estoppel bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." *New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001).[10] It "applies when (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Republic of Ecuador v.*

[9] In addition, Plaintiffs argue that Gruss waived its arbitration argument by failing to raise it before the German court. *Id.* at 13–14. The Second Circuit recently clarified the standard a court applies to determine if a party waived its rights under an arbitration agreement: "Did the moving party knowingly relinquish the right to arbitrate by acting inconsistently with that right?" *Doyle v. UBS Fin. Servs., Inc.*, 144 F.4th 122, 129–130 (2d Cir. 2025). A waiver analysis is unnecessary, however, because Gruss is not attempting to assert its right to compel arbitration and is instead arguing that the German court proceeding contradicts the arbitration agreement such that C.P.L.R. § 5304(b)(5) applies and the Judgments should not be recognized. *See* Gruss Reply at 6.

[10] The doctrine of issue preclusion encompasses collateral estoppel. *Taylor v. Sturgell*, 553 U.S. 880, 892 n.5 (2008).

*Chevron Corp.*, 638 F.3d 384, 400 (2d Cir. 2011). Where, as here, one party seeks to use offensive collateral estoppel, a court "must also satisfy itself that application of offens[iv]e collateral estoppel is fair." *Flood v. Just Energy Marketing Corp.*, 904 F.3d 219, 236 (2d Cir. 2018).[11]

All four elements for collateral estoppel to apply are satisfied. To determine whether the German proceeding violated an arbitration clause, the Court would need to determine if the arbitration clause was valid. The German court in the Miller Action addressed the same issue as to the same document. The first element is met. Next, the validity of the arbitration clause was "actually litigated and decided" in the Miller Action, satisfying the second element. As to the third element, Gruss was a party to the Miller Action and plainly had a full and fair opportunity to litigate the issue in that action. Lastly, the issue was necessary to support a valid and final judgment because—if the German court had accepted Gruss's arguments regarding mandatory arbitration—it would not have awarded the judgment in the Miller Action.

In addition, applying offensive collateral estoppel is fair. Gruss had an opportunity to litigate and appeal the German court's decision in the Miller Action. *Id.* at 237. Gruss has not identified any court decisions contradicting the German court's determination in the Miller Action that the arbitration clause at issue in these customer documents was invalid. *Bear, Stearns & Co.*, 409 F.3d at 91. And there is no indication that Gruss did not have an adequate incentive to litigate the Miller Action to avoid an adverse judgment. *See Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1486 (2d Cir. 1995). Because all four

[11] Offensive collateral estoppel refers to one party seeking to bar another party from relitigating issues that were decided against the latter party in a litigation the former party did not participate in. *Bear, Stearns & Co. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d Cir. 2005). Here, Plaintiffs were not parties to the Miller Action but are attempting to bar Gruss from re-arguing an issued decided against it in the Miller Action, so they are seeking offensive collateral estoppel.

elements of collateral estoppel are met, and application of offensive collateral estoppel is fair, the Court will defer to the German court's determination in the Miller Action that the suite of client intake agreements lacked a valid arbitration clause. Section 5304(b)(5) therefore does not apply because the Plaintiffs' lawsuits in Germany were not contrary to a (valid) arbitration agreement.

Gruss raises several arguments in opposition. Gruss highlights that the court in the Miller Action determined the arbitration clause was invalid under the New York Convention because the Customer Agreement was not signed by both parties. But that determination, Gruss argues, conflicts with the Supreme Court's decision in *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC* ("*Outokumpu*"), 590 U.S. 432 (2020). *See* Gruss Opp. at 19. This argument misapprehends the holding of *Outokumpu*. There, the Supreme Court held that the New York Convention did not preclude the application of state-law equitable estoppel doctrines for a non-signatory to enforce an arbitration agreement. *Outokumpu*, 590 U.S. at 441; *see Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 68 n.29 (2d Cir. 2021) (describing *Outokumpu*'s holding). The decision did "not address whether Article II(2) requires a signed agreement." *See Outokumpu*, 590 U.S. at 445 n.3. The German court's decision in the Miller Action involved whether a valid arbitration agreement existed under Article II(2), not the application of equitable estoppel doctrine. As a result, it does not conflict with *Outokumpu*.

Gruss also argues that collateral estoppel cannot apply because Miller was a German citizen while Plaintiffs in the present action are citizens of Switzerland and Austria. Gruss Opp. at 20. This distinction is relevant, Gruss argues, because the German court in the Miller Action highlighted Miller's German residency before applying German conflict of law principles. *Id.* This argument ignores that Miller's residency was irrelevant to the German court's specific determination in the Miller Action that no valid arbitration agreement existed under the New

York Convention. *See* Dkt. No. 111-6 at 5 ("*Irrespective of the question of which law to apply* in order to assess the validity of the arbitration agreement, [the agreement] does not even comply with the UN Convention's formal requirements which stipulate an agreement in writing signed by both parties or contained in letters or telegram exchanged between the parties as prerequisite[s] for effectiveness.") (emphasis added).

Last, Gruss argues that the German court in the Miller Action disregarded Gruss's argument that its agent did sign an arbitration agreement. Gruss argues that its agent would have signed the Options Agreement and that—because the Options Agreement was on the other side of the Terms Agreement (which had an arbitration clause)—Gruss therefore signed an agreement containing an arbitration clause. Gruss Opp. at 19; Dkt. No. 103 ¶ 26. The Court rejects this argument because it is unambiguous that the Options Agreement and Terms Agreement were unique contracts intended for different purposes.

As discussed above, *see supra* 3–4, the Options Agreement opens with text stating that exchange rules require Gruss to seek certain information "intended to assist [Gruss] in making recommendations that are appropriate to your financial objectives." Dkt. No. 102-1 at 7. It then solicits a variety of "personal & financial data." *Id.* The bottom of the Options Agreement includes a signature block with the following fields: "customer signature/date"; "R.R. signature/date"; "regional manager approval/date"; and "approved/date." *Id.* The Terms Agreement meanwhile begins with the following sentence: "This letter is written to you to set forth our respective rights and obligations." *Id.* at 8. It includes 17 different terms and conditions, including an arbitration clause. *Id.* And it includes a signature block with the following fields: "client signature"; "date"; "name of account"; and a field for other principals to sign "if any." *Id.*

"Whether multiple writings should be construed as one agreement depends upon the intent of the parties." *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005). The parties' intent "is typically a question of fact for the jury," but where "the documents in question reflect no ambiguity as to whether they should be read as a single contract, the question is a matter of law for the court." *Id.* "The legally operative question is 'whether the contracts were part of a single transaction intended to effectuate the same purpose.'" *Geller Biopharm, Inc. v. Amunix Pharmaceuticals, Inc.*, No. 20-CV-04334 (JPC), 2021 WL 4155015, at *5 (S.D.N.Y. Sept. 13, 2021) (quoting *TVT Records*, 412 F.3d at 90). The Options Agreement and Term Agreement unambiguously should be construed as two separate agreements. The opening paragraphs of each demonstrate they were not intended "to effectuate the same purpose." *TVT Records*, 412 F.3d at 89. While the Options Agreement was "intended to assist [Gruss] in making recommendations," the Terms Agreement was "written . . . to set forth [the parties'] respective rights and obligations." Dkt. No. 102-1 at 7–8. There is no allegation—or plausible reading of either document—that one agreement would be meaningless without the incorporation of another. *See Geller Biopharm, Inc.*, 2021 WL 4155015, at *5. The two do not refer to one another, which also "weighs against the conclusion that the documents were intended to be read together." *In re Lehman Bros. Holdings Inc.*, 479 B.R. 268, 279 (S.D.N.Y. 2012). And, most tellingly, the documents include not only separate signature blocks but signature blocks with completely different fields. *Compare* Dkt. No. 102-1 at 7, *with id.* at 8. Accordingly, there is no ambiguity that the two documents should be read as separate agreements, and the fact that the German court did not take seriously Gruss's specious arguments to the contrary is not a reason to reject the application of collateral estoppel to this case.

### 2. The Court Will Not Exercise Its Discretion to Refuse to Recognize the Judgments

Finally, even if the proceedings before the German court did conflict with a valid arbitration agreement, the Court would in its discretion decline to apply the discretionary exemption at Section 5304(b)(5). *See Malherbe*, 2023 WL 199425, at *2. Section 5304(b)(5) permits—but does not require—a court to refuse to recognize a foreign judgment that derives from a proceeding "contrary to an agreement between the parties under which the dispute in question was to be determined otherwise than by a proceeding in that court." N.Y. C.P.L.R. § 5304(b)(5). The commentary to Section 5304(b)(5) provides that it applies in a "situation in which the foreign court entertained in litigation, over the objection of a party, a dispute that both sides had agreed to submit to arbitration." Richard Reilly, Practice Commentaries, N.Y. C.P.L.R. 5304, C5304:3 (2021). As a result, "a judgment creditor who deliberately sought out a court in a jurisdiction hostile to arbitration, although having agreed to arbitrate, can be denied recognition of the judgment." *Id.* It also states that a "court must look into the reason why the foreign court disregarded the [arbitration] agreement." *Id.*

Gruss never objected to the German proceedings as to these Plaintiffs as violative of arbitration agreements. It is undisputed that neither Plaintiffs nor Gruss have copies of Plaintiffs' account-opening documents, which include the arbitration clause. And there is no indication that Plaintiffs commenced suit in Germany because it was a forum hostile to arbitration agreements. Instead, Germany presented a logical forum for Plaintiffs because it borders both Austria and Switzerland, was where Gluch churned Plaintiffs' accounts, and was the jurisdiction under whose laws Gluch operated. Moreover, Gruss is not actually seeking to arbitrate Plaintiffs' claims, such that this is a dispute about which forum should hear and decide the parties' dispute. Rather, Gruss is seeking to use a purported arbitration agreement solely as a

shield, to prevent Plaintiffs from accessing <u>any</u> avenue to recover against Gruss.[12] The Court therefore cannot ascertain any prudential concerns that would counsel against recognizing the Judgments.

Separately, the Court cannot ignore that Gruss attempted to fight the Miller Action by invoking the arbitration clause and lost. Gruss opted not to raise a challenge (or even appear) in Plaintiffs' lawsuits. Nor, as noted above, did Gruss at any time seek to bring these Plaintiffs into arbitration proceedings on their claims. Especially given Article 53's joint purposes of codifying case law "based on principles of international comity" and serving to offer "streamlined enforcement" of foreign judgments in New York, the Court thinks it best—based on its careful review of the facts and history of this case—to decline the discretion afforded under Section 5304(b)(5) and proceed to recognize the Judgments. *See CIBC Mellon Trust Co.*, 100 N.Y.2d at 222 (N.Y. 2003).

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for summary judgment is GRANTED and Gruss's motion for summary judgment is DENIED. The Clerk of Court is respectfully directed to enter judgment in favor of Plaintiffs and CLOSE this case.

Dated: August 3, 2026
New York, New York

SO ORDERED.

MARGARET M. GARNETT
United States District Judge

[12] Indeed, it is unclear what recourse Plaintiffs would have besides enforcing the Judgments. No party has the account-opening agreements that Plaintiffs and Gruss executed that purportedly contain the arbitration clauses, and Gruss has never made any efforts, despite the passage of years, to initiate arbitration proceedings or bring Plaintiffs' claims into arbitration.